**STORMY CLIME LTD.,**
Plaintiff-Appellee,

v.

**PROGROUP, INC., Defendant-Appellant.**

No. 246, Docket 86–7576.

United States Court of Appeals,
Second Circuit.

Argued Oct. 23, 1986.

Decided Jan. 23, 1987.

Richard H. Evans, Cincinnati, Ohio (Wood Herron & Evans, Cincinnati, Ohio; Thomas G. Gallatin, Mudge Rose Guthrie Alexander & Ferdon, New York City, on the brief), for defendant-appellant.

James M. Rhodes, Jr., New York City (Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, on the brief), for plaintiff-appellee.

Before KAUFMAN, NEWMAN, and PRATT, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal concerns the application of the functionality defense in a trade dress infringement suit under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), in which a manufacturer alleges that a competitor improperly copied the overall design of its product. The issue arises on an appeal by defendant-appellant ProGroup, Inc. from an order of the District Court for the Southern District of New York (Louis L. Stanton, Judge), entered at the request of plaintiff-appellee Stormy Clime Ltd., which preliminarily enjoined ProGroup from marketing a rainjacket. Because the appropriate legal standard concerning the functionality defense was incompletely applied, we vacate the preliminary injunction and remand for further proceedings.

## Background

Stormy Clime, a New York corporation, designs and sells sportswear. Its products are sold primarily in country club proshops. Stormy Clime began operations in 1982 with the introduction of a waterproof rainjacket which it has sold under its "COOL IT" trademark. The rainjacket is made of a high-sheen, waterproof fabric. Its distinctive feature is the employment of three shingles or vents—horizontal slots covered by a flap—designed to facilitate release of perspiration and body heat while keeping the wearer protected from rain and wind. Stormy Clime's COOL IT rainjacket is normally sold as part of a rainsuit comprising a jacket and matching pants. Revenue from sales of the COOL IT line of sportswear has grown from $400,000 in 1982 to approximately $2.1 million in 1985.

ProGroup markets its line of rainsuits under the trademark "DUCKSTER". After considering Stormy Clime's COOL IT rainjacket, as well as those of several other manufacturers, ProGroup developed its latest DUCKSTER rainjacket, which features two horizontal shingles/vents, a high-sheen fabric, and a hood. In designing its jacket, ProGroup was careful not to infringe Stormy Clime's United States Patent No. 4,408,356 for tacking the shingles so as to prevent them from being lifted by the wind. The use of ventilation shingles on rainjackets was the subject of U.S. Patent Nos. 1,562,767 and 2,259,460, both of which have long since expired.

At a Professional Golf Association trade show on January 23, 1986, ProGroup introduced its latest DUCKSTER line of rainsuits. Because of their shingled design, high-sheen fabric, and colors, these DUCKSTER rainjackets closely resembled Stormy Clime's COOL IT rainjackets.

On January 24, 1986, the day after ProGroup introduced its DUCKSTER rainjackets, Stormy Clime filed suit against ProGroup in the Southern District of New York, alleging trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) (1982). On April 28, 1986, following initial discovery, Stormy Clime moved for a preliminary injunction.

The exhibits and documentary evidence introduced in the trial court indicate that both the Stormy Clime and ProGroup rainjackets feature horizontal shingles/vents (three in the COOL IT rainjacket, two in the DUCKSTER rainjacket), a high-sheen fabric, and a hood. The COOL IT rainjacket comes in fourteen colors; the DUCKSTER rainjacket comes in six of these colors. The shoulders of the COOL IT rainjacket are constructed from five pieces of fabric attached by seams; the DUCKSTER rainjacket features a seamless shoulder construction. The COOL IT rainjacket has top-entry, patch pockets; the DUCKSTER rainjacket uses slant-entry, integral pockets. The COOL IT rainjacket has a stand-up collar with snaps; the DUCKSTER rainjacket has a laydown collar without snaps. The COOL IT rainjacket, regardless of fabric color, has a white front zipper, a white drawstring at the waist, and a white zipper on the collar which closes a pocket housing its hood. The DUCKSTER rainjacket has a front zipper matching the color of the jacket fabric and does not have a drawstring. Although the initial version of the DUCKSTER rainjacket featured a white zipper on the collar of lighter-colored jackets and a black zipper on the collar of darker-colored jackets, the current version has a detachable hood and no zipper on the collar. The COOL IT rainjacket does not have any external label. The DUCKSTER rainjacket has a small metal insignia attached to the sliding element of its front zipper. Both rainjackets have labels clearly displaying their respective trademarks sewn just below the inside of the collar.

Stormy Clime alleged that the design of the DUCKSTER rainjacket infringed the "trade dress" of its COOL IT rainjacket. In addition to disputing that the jackets were confusingly similar, ProGroup defended on the ground that the design was functional and hence not protectable under trade dress law. ProGroup emphasized the need for horizontal shingles, a high-sheen waterproof fabric, and a hood in any high-quality, low-cost, waterproof jacket suitable for use by golfers. ProGroup also noted the several differences between the COOL IT and DUCKSTER rainjackets.

On July 2, 1986, Judge Stanton issued a preliminary injunction barring ProGroup from making, marketing, or selling its shingled rainjacket and ordering ProGroup to inform its distributors and customers of the terms of the injunction. Stormy Clime posted a $50,000 bond. ProGroup appeals the preliminary injunction on the sole ground that Judge Stanton applied an incorrect legal standard in analyzing ProGroup's functionality defense.

### Discussion

It is well established in this Circuit that a party seeking a preliminary injunction must establish

> both possible irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985). We must affirm the issuance of the preliminary injunction unless we find, in light of applicable legal standards, that Judge Stanton's decision constituted an abuse of discretion. *See id.* at 74; *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975). A failure to consider relevant factors or to apply the proper le-

gal standard constitutes such an abuse. *See Parents' Ass'n of P.S. 16 v. Quinones,* 803 F.2d 1235, 1239 (2d Cir.1986); *Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 315 (2d Cir.1982); *see generally 7 Moore's Federal Practice* ¶ 65.04[2] at 65-48-49, ¶ 65.21 at 65-154-57 (2d ed. 1986 & Supp.1986-87).

Though recited frequently in the reported decisions, including our own, this formulation of an incorrect application of a legal standard as constituting an "abuse of discretion" is not entirely satisfactory. Judicial discretion normally implies the authority in a decision-maker to decide a disputed matter either way, or, in some circumstances, to varying degrees, as where a continuance may be granted for any one of several appropriate intervals. Discretion is said to be "abused" ("exceeded" would be both a more felicitous and correct term) when the decision reached is not within the range of decision-making authority a reviewing court determines is acceptable for a given set of facts. This determination that the range of acceptable decision-making has been exceeded in a particular case is assuredly one of law, but it is analytically distinct from a determination that a legal standard applicable to a generality of fact situations has been ignored, incorrectly applied, or inadequately applied in a particular case. That sort of error of law, if of significance to an outcome, can always be the basis for appellate revision of trial court decisions. In such cases, it would be clearer to say directly that the decision is revised because of an error of law, rather than call such an error an abuse of discretion. *See* Friendly, *Indiscretion About Discretion,* 31 Emory L.Rev. 747, 773-78 (1982).

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits the marketing of a product conveying a "false designation of origin," has been interpreted to entitle the first manufacturer of a product to an unregistered trademark in the "trade dress" of its product. *See LeSportsac, supra,* 754 F.2d at 75; *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 77-78 (2d Cir.1981) (*Warner I* ). The trade dress of a product "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics." *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983). Although "trade dress" has traditionally referred to the packaging or labeling of a product, *see id.* at 980; *LeSportsac, supra,* 754 F.2d at 75, this Circuit has recognized that the design of a product may function as its "packaging," thereby entitling the manufacturer to trade dress protection for the appearance of the product. *See id.; Warner I, supra,* 658 F.2d at 78; *Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 949 (2d Cir.1981).

■ The typical case in which a first manufacturer seeks to prevent the copying of the appearance of its product under section 43(a) of the Lanham Act involves two stages of inquiry. In the first stage, the plaintiff must show that the trade dress of its product has acquired secondary meaning in the marketplace and that the design of the competitor's product is confusingly similar to that of the plaintiff's product. *See LeSportsac, supra,* 754 F.2d at 75 (quoting *20th Century Wear, Inc. v. Sanmark-Stardust Inc.,* 747 F.2d 81, 92 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985)); *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 332 (2d Cir.1983) (*Warner II* ); *Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 303 (2d Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982); *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444-45 (Fed.Cir.1984). Even if a manufacturer makes both of these showings, the competitor can prevail in the second stage of inquiry by showing that the similar arrangement of features is functional. *See LeSportsac, supra,* 754 F.2d at 75-76 (placing the burden of proof of functionality on the alleged infringer); *Warner II, supra,* 724 F.2d at 330-32.

Since ProGroup has elected not to challenge on this appeal Judge Stanton's find-

ings of irreparable harm, a balance of the hardships tipping decidedly in Stormy Clime's favor, and serious questions going to the merits of the issues of secondary meaning and confusing similarity, the sole issue before us now is whether Judge Stanton erred in finding that Stormy Clime has raised serious questions going to the merits of whether ProGroup's functionality defense was available.

Judge Stanton analyzed the functionality question as follows:

> ProGroup asserts that three of the features constituting the overall "look" of the COOL IT jacket, the shingles/vents, the high-sheen material, and the hood, are functional, and only one (the distinctive white trim, which ProGroup does not use) is nonfunctional. Thus, it argues that the overall "look" of the COOL IT jacket is not entitled to trademark protection. "But by breaking [Stormy Clime's] trade dress into its individual elements and then attacking certain of those elements as functional, [ProGroup] misconceives the scope of the appropriate inquiry." *LeSportsac,* 754 F.2d at 76. In determining whether the trade dress or "look" is functional one should consider it overall and as a whole, not break the trade dress into its individual features. If, seen as a whole, the design or trade dress "primarily serves a legitimate trademark purpose—identifying the source of the product— ... [it is] eligible for protection" even though it might also serve functional purposes. *Id.* at 78. Here the appearance of the Stormy Clime jacket presents a "particular combination and arrangement of design elements that identify" and distinguish it from other jackets. *Cf. id.* at 76. The "look" of plaintiff's jacket "distinguishes the garment as being a COOL IT jacket specifically from Stormy Clime." (Drotman Aff., ¶ 14.) The arrangement of the functional features is original with plaintiff's jacket, not required by the function itself, and thus entitled to protection. *See LeSportsac,* 754 F.2d at 78. At the very least, Stormy Clime has raised seri-

ous questions going to the merits of this issue.

*Stormy Clime, Ltd. v. ProGroup, Inc.,* 230 U.S.P.Q. 685, 687 (S.D.N.Y.1986).

Though the District Court drew useful guidance from *LeSportsac,* the analysis of functionality and the application of the defense in this case was incomplete, leaving substantial doubt whether Stormy Clime's objection to ProGroup's defense presents a fair ground of litigation, even at this preliminary stage of the litigation. In *LeSportsac,* Chief Judge Feinberg began an analysis of functionality by noting that a functional feature " 'is essential to the use or purpose of an article or ... affects the cost or quality of the article.' " *LeSportsac, supra,* 754 F.2d at 76 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982)). The *LeSportsac* opinion goes on to quote Judge Oakes' elaboration of this definition in *Warner II:*

> A design feature of a particular article is "essential" only if the feature is dictated by the functions to be performed; a feature that merely accomodates a useful function is not enough. *In re Morton-Norwich Products, Inc.,* 671 F.2d 1332, 1342 (Cust. & Pat.App.1982) (shape of plastic container for spray products not essential to its purpose as a sprayer). And a design feature "affecting the cost or quality of an article" is one which permits the article to be manufactured at a lower cost, e.g., *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 122, 59 S.Ct. 109, 115, 83 L.Ed. 73 (1938) (pillow shape of shredded wheat biscuit functional as cost would be increased and quality lessened by other form), or one which constitutes an improvement in the operation of the goods, e.g., *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193, 195 (1st Cir.1980) (two-tier design of woodstove functional because improving the operation of the stove in three respects).

*LeSportsac, supra,* 754 F.2d at 76 (quoting *Warner II, supra,* 724 F.2d at 331). Even

accepting Stormy Clime's claim to an original arrangement of features—shingles/vents, high-sheen waterproof fabric, and hood—on its rainjacket, we fail to see how this arrangement is not "essential" to the purpose of the product—to keep golfers dry, free to move, and comfortable during rain showers, all at low cost. Judge Stanton's assertion that "the arrangement of functional features [on Stormy Clime's COOL IT rainjacket is] not required by the function itself" is neither explained nor justifiable on the record thus far developed. Furthermore, Judge Stanton's opinion does not reckon with ProGroup's substantial contention that the similarities between the DUCKSTER and COOL IT rainjackets reflect cost and quality considerations. *See* Defendant ProGroup's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction at 10–12.

Moreover, the facts in *LeSportsac* provide a contrast with the instant case that points to the availability of the functionality defense. In *LeSportsac*, the plaintiff LeSportsac Inc. began selling a distinctive line of lightweight luggage in 1976. The luggage was made from parachute nylon and trimmed with color-coordinated cotton-webbing straps and color-coordinated zippers with hollow rectangular pulls. The LeSportsac luggage was marked by repetitive printing of the LeSportsac logo on the cotton tape. *See LeSportsac, supra,* 754 F.2d at 74. In 1984, K mart Corporation began selling a competing line of luggage that resembled the LeSportsac line in substantially every respect including the repetitive logo; K mart used the trademark "di paris sac." Unlike the present case, the District Court in *LeSportsac* made specific findings regarding the functionality of the arrangement of features comprising the plaintiff's product:

> Plaintiff adduced evidence at the hearing that its unique features are nonfunctional, i.e., that there are numerous ways to manufacture lightweight nylon luggage other than that employed by plaintiff. There is no need, for example, to have cotton webbing on the outside seam of the bag, or to have outer zippered pockets. Similarly—and more significantly—there is no need to have hollow rectangular zipper pulls.

> Defendant introduced a plethora of exhibits whose various designs undermine its own functionality argument. All are nylon bags, yet none bears the combination of design features used by plaintiff and imitated by defendant.

*LeSportsac, Inc. v. K Mart Corp.,* 607 F.Supp. 183, 185 (E.D.N.Y.1984). Since extensive evidence established that the arrangement of the features of the LeSportsac luggage was ornamental and nonfunctional, the Court of Appeals could readily rely upon the District Court's analysis and conclude that the District Court acted well within its discretion in issuing a preliminary injunction. *See LeSportsac, supra,* 754 F.2d at 76–77.

By contrast, the arrangement of the principal features common to both the COOL IT and DUCKSTER rainjackets—shingles/vents, high-sheen waterproof fabric, and hood—appear to be dictated by the purpose of providing a low-cost, unencumbering, waterproof jacket for wear while playing golf and other sports. Though the rainjackets are similar in appearance, their purely ornamental features and labeling differ in almost every respect other than color, and Stormy Clime, having elected to manufacture its product in fourteen different colors, is not in a strong position to complain that a competitor's product uses a few of those same colors.

■ Furthermore, analysis of the functionality defense requires consideration of additional factors, especially the purpose of the functionality defense. Judge Oakes' opinion in *Warner II* points out that the important purpose of the functionality defense is "to protect advances in functional design from being monopolized [so as] to encourage competition and the broadest dissemination of useful design features." *Warner II, supra,* 724 F.2d at 331. Balancing this purpose with the Lanham Act's purpose of preventing confusion as to the source of products, we believe that the

functionality inquiry in the present case should have focused on whether bestowing trade dress protection upon Stormy Clime's arrangement of features " 'will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.' " *Sicilia di R. Biebow & Co. v. Cox*, 732 F.2d 417, 429 (5th Cir.1984) (quoting *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 1342 (Cust. & Pat. App. 1982)). *See Sunbeam Corp. v. Equity Industries Corp.*, 635 F.Supp. 625, 635–37 (E.D.Va.1986) (finding that "gumball dispenser configuration" for food processor is functional and hence not protectable under section 43(a) of the Lanham Act); *see also LeSportsac, supra*, 754 F.2d at 77 (noting that "K mart's ability to compete is not unduly hindered by the determination that LeSportsac's particular configuration of design features is nonfunctional....").

█ We do not mean to suggest that the functionality inquiry is equivalent to the "important ingredient in commercial success" test applied in *Industria Arredamenti Fratelli Saporiti v. Charles Craig, Ltd.*, 725 F.2d 18, 19 (2d Cir.1984), and limited in *LeSportsac, supra*, 754 F.2d at 77–78. *But cf. Prufrock Ltd., Inc. v. Lasater*, 781 F.2d 129, 133 (8th Cir.1986). As we explain below, a critical aspect in considering hindrance to competition is whether bestowing trade dress protection on a product design prevents potential competitors from entering a market that is not foreclosed by a valid patent. Thus, a distinctive design or arrangement of features that is an important ingredient in the commercial success of a product but is not "essential to the use or purpose" of the product and does not "affect[ ] the cost or quality" of the product could be protectable trade dress. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982).

█ In conducting its inquiry, the District Court should assess the degree of functionality of the similar features, *see In re Morton-Norwich Products, Inc., supra*, 671 F.2d 1332, 1340–41, the degree of similarity between the non-functional (ornamental) features of the competing products, *see LeSportsac, supra*, 754 F.2d at 74, 77 (noting that K mart emulated LeSportsac's logo); *cf. Litton Systems, Inc. v. Whirlpool Corp., supra*, 728 F.2d at 1446 (discussing labeling), and the feasibility of alternative arrangements of functional features that would not impair the utility of the product, *see Sicilia di R. Biebow & Co. v. Cox, supra*, 732 F.2d at 429; *Sunbeam Corp. v. Equity Industries Corp., supra*, 635 F.Supp. at 636–37; *see also Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*, 791 F.2d 423, 426 n. 3 (5th Cir.1986); *Prufrock Ltd., Inc. v. Lasater*, 781 F.2d 129, 132–33 (8th Cir.1986). These factors should be considered along a continuum. *See* 3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 19.33 at 132 (L.Altman 4th ed. 1983) ("Functionality is often a matter of degree, rather than a binary yes-or-no matter."). On one end, unique arrangements of purely functional features constitute a functional design. On the other end, distinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional and hence eligible for trade dress protection. In between, the case for protection weakens the more clearly the arrangement of allegedly distinctive features serves the purpose of the product (including maintenance of low cost), especially where the competitor copying such features has taken some significant steps to differentiate its product. In this case, for example, ProGroup places its DUCKSTER trademark prominently on a label at the inside of the neck, a traditional means of identifying the manufacturer of clothing. The trademark is also displayed on the zipper pull, on a hang-tag, and on the plastic bag in which the jacket is packaged.

█ Courts must proceed with caution in assessing claims to unregistered trademark protection in the design of products so as not to undermine the objectives of the pat-

**978**

ent laws. Patents for inventions and designs, *see* 35 U.S.C. §§ 101, 171 (1982), are the principal means by which we protect intellectual property embodied in products. By bestowing limited periods of protection to novel, non-obvious, and useful inventions and new, original, and ornamental designs—seventeen years for invention patents, 35 U.S.C. § 154 (1982), and fourteen years for design patents, 35 U.S.C. § 173 (1982)—the patent laws encourage progress in science and the useful arts. *See* U.S. Const. art. 1 § 8, cl. 8. Society reaps the rewards of these advances in the short term to the extent that patent holders and their licensees incorporate protected ideas into new and useful products. These rewards are more fully realized in the longer term because novel ideas fall into the public domain upon the expiration of patent protection. Since trademark protection extends for an unlimited period, expansive trade dress protection for the design of products would prevent some functional products from enriching the public domain.

This threat is particularly great when, as in the instant case, a first manufacturer seeks broad trade dress protection for a product on the ground that its arrangement of predominantly functional features is distinctive. Even if Stormy Clime were to have a patent on the use of horizontal shingled vents in rainjackets, it is unlikely that it would have as much monopoly power as an unregistered trademark in the shingled look would provide. As the Supreme Court noted in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), a case involving the scope of state unfair competition law,

[o]nce [a] patent issues, it is strictly construed, *United States v. Masonite Corp.*, 316 U.S. 265, 280 [62 S.Ct. 1070, 1078, 86 L.Ed. 1461] (1942), [and] it cannot be used to secure any monopoly beyond that contained in the patent, *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 492 [62 S.Ct. 402, 405, 86 L.Ed. 363] (1942), . . . Finally, and especially relevant here, when the patent expires the monopoly created by it expires, too, and the right to make the article—including the

right to make it in precisely the shape it carried when patented—passes to the public. *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 120–122 [59 S.Ct. 109, 114–115, 83 L.Ed. 73] (1938); *Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 185 [16 S.Ct. 1002, 1008, 41 L.Ed. 118] (1896).

*Sears, Roebuck & Co. v. Stiffel Co., supra,* 376 U.S. at 230, 84 S.Ct. at 788.

To avoid undermining the purpose of the patent laws to place useful innovations in the public domain after expiration of a limited monopoly, courts must be sensitive to whether a grant of trade dress protection would close all avenues to a market that is otherwise open in the absence of a valid patent. *See Prufrock Ltd., Inc. v. Lasater, supra,* 781 F.2d at 132–33; *Sicilia di R. Biebow & Co. v. Cox, supra,* 732 F.2d at 428; *Sunbeam Corp. v. Equity Industries Corp., supra,* 635 F.Supp. at 636; *cf. In re Deister Concentrator Co., Inc.,* 289 F.2d 496, 504 (Cust. & Pat. App. 1961) (noting that the reason for refusing to protect functional elements against copying is not that they "cannot or do not indicate source to the purchasing public but that there is an overriding public policy of preventing their monopolization, of preserving the public right to copy"). In the instant case, the District Court does not appear to have considered whether *any* feasible shingled rainjacket could be manufactured that would not appear similar in key respects to Stormy Clime's COOL IT rainjacket. *Cf. LeSportsac, supra,* 754 F.2d at 77 (noting that "[f]or example, the cotton carpet tape and carrying straps could be placed differently, contrasted in color with the bag or be made thicker or thinner; zipper pulls could be solid or nonrectangular; the repeating elliptical logo could be changed or placed differently").

By focusing upon hindrances to legitimate competition, the functionality test, carefully applied, can accommodate consumers' somewhat conflicting interests in being assured enough product differentiation to avoid confusion as to source and in being afforded the benefits of competition

among producers. *Cf. Sicilia de R. Bie-bow & Co. v. Cox, supra,* 732 F.2d at 429–30. Moreover, this test encourages those seeking trade dress protection for their products to select distinctive non-functional identifying marks.[1]

### Conclusion

In light of the foregoing, we have substantial doubts whether this record permitted issuance of a preliminary injunction. In any event, we are convinced that the District Court did not apply the governing legal standard with sufficient completeness to demonstrate that preliminary relief was warranted. Consequently, we vacate the preliminary injunction and remand for further proceedings consistent with this opinion. Though the propriety of a preliminary injunction might yet be demonstrated, we strongly urge the parties to proceed directly to the merits so that, on a fully developed record, the District Court can determine whether any relief is warranted.

Preliminary injunction vacated; cause remanded for further proceedings.

---

**1.** Stormy Clime's COOL IT rainjacket conspicuously avoids distinctive external markings other than its shingled look. *Cf. LeSportsac,* 754 F.2d at 74, 76–77. The COOL IT line of sportswear comes in solid common colors; its logo is not ascertainable from the outside of the jacket. Other than the vents, the only distinctive external feature is white zippers, which ProGroup does not now duplicate.