INVERNESS CORPORATION, Plaintiff,

v.

WHITEHALL LABORATORIES and American Home Products Corporation, Defendants.

No. 87 Civ. 0113KTD.

United States District Court, S.D. New York.

Nov. 30, 1987.

Blum Kaplan, New York City, Steven B. Pokotilow, Laura E. Goldbard, Anita K. Yeung, of counsel, for plaintiff.

Darby & Darby, New York City, Michael J. Sweedler, Beverly B. Goodwin, of counsel, for defendants.

## MEMORANDUM & ORDER

### KEVIN THOMAS DUFFY, District Judge:

This case is now before me on remand from the Court of Appeals for the Second Circuit, 819 F.2d 48. On February 23, 1987, I held a hearing on plaintiff's Order to Show Cause. Following the close of the evidence at that hearing, I stated my conclusions on the record in open court. I held a subsequent hearing on March 2, 1987, concerning the form of the Order Granting Preliminary Injunction, I filed such an Order on March 3, 1987. Defendants appealed that Order Granting Preliminary Injunction to the Court of Appeals for the Second Circuit on March 4, 1987. The Court of Appeals, in a *per curiam* decision dated May 21, 1987, retained jurisdiction of the appeal and ordered a remand to this court for further proceedings consistent with that Court's Opinion. Pursuant to that Opinion, this Memorandum and Order constitutes my findings of facts and conclusions of law.

## FACTS

Plaintiff Inverness Corporation ("Inverness") is a New Jersey corporation, having its principal place of business in New Jersey. Inverness manufactures a variety of health and cosmetic products.

Defendant American Home Products Corporation is a Delaware corporation located and doing business in New York. Defendant Whitehall Laboratories is a division of American Home Products Corporation located and doing business in New York. Whitehall manufactures health and cosmetic products and proprietary drug products. (Both defendants will be collectively referred to as "Whitehall").

This is a civil action for trade dress infringement. Inverness alleges unfair competition, false designation of origin, and false description by Whitehall in violation of 15 U.S.C. § 1125(a) (1982 & Supp. III 1985) and unfair competition in violation of the common law of the state of New York. The products involved in this case are roll-on depilatories (hair removers).

In March, 1985, Inverness developed and introduced into the market a roll-on depilatory product under the trademark ONE TOUCH. The product's packaging consists of a flat, square-shaped white plastic container portion, in which the depilatory fluid is held, and a cylindrical white plastic roll-on applicator portion, which allows the user to spread a wide band of depilatory liquid directly onto the skin. A clear plastic cap fits over the applicator portion. A rectangular label is attached to the container portion. The label has a white background and portrays a photograph of a seated, nude woman. Beneath the photograph is a printed description of the product in either mostly lavender ("regular formula"), or aqua ("for sensitive skin"). The pink ONE TOUCH trademark logo appears at the bottom of the label. For presentation to consumers, the applicator is attached by clear plastic to a lavender or aqua backing card (a "temporary marketing device") that corresponds to the color of the label. Inverness began advertising and promoting ONE TOUCH in May, 1985, in nationally distributed magazines. Inverness has distributed ONE TOUCH in most major drug store chains, independent drug stores, cosmetics shops, and most mass merchandise outlets. ONE TOUCH achieved sales in 1985 of $780,000, in 1986 of $1,135,000, and projected sales in 1987 of $1,700,000.

For many years, Whitehall has sold a line of depilatory products under the trademark NEET, the second leading brand of depilatories in the United States. Since about 1980, Whitehall has sold its NEET depilatory lotions and creams in plastic bottles or squeeze tubes, marked with lavender ("floral scent") or brown ("cocoa butter") NEET labels, and sold in boxes. An aqua ("aloe vera") label was added to the NEET product line in late 1983 or early 1984. The

labels display the NEET trademark in large white underlined script, and additional information about the product in smaller script around the trademark.

Whitehall became interested in Inverness' ONE TOUCH products and, in the summer of 1985, Whitehall approached Inverness about the possibility of Inverness manufacturing a product similar to ONE TOUCH for Whitehall. The possibility of Whitehall manufacturing and selling a roll-on depilatory product to Inverness was also considered. Representatives of the two companies met in June or July, 1985, and Whitehall undertook a preliminary evaluation of ONE TOUCH with a view toward possibly manufacturing a roll-on depilatory under a license for both Inverness and Whitehall. No confidential information was given to Whitehall by Inverness, and no licensing agreement between the two companies was reached. The negotiations broke down in the autumn of 1985 when Inverness declined to provide information regarding the cost of materials to Whitehall.

When negotiations between the companies failed, Whitehall proceeded to develop and manufacture its own depilatory roll-on product under its NEET trademark. Like ONE TOUCH, the NEET packaging consists of a flat, square-shaped white plastic container portion, in which the depilatory fluid is held, and a cylindrical white plastic roll-on applicator portion, which allows the user to spread a wide band of depilatory liquid directly onto the skin. Like ONE TOUCH, a clear plastic cap fits over the applicator portion. Like ONE TOUCH, a rectangular label is attached to the container portion. The label retains the color schemes traditionally used with the NEET product line, and displays the NEET trademark in large white underlined script on a lavender, aqua, or brown background. Additional information about the product is located around the trademark in smaller print. In addition, a small, round label appears on the applicator portion, with "new roll-on" printed in white on a corresponding lavender, aqua, or brown background. Apart from the labels, the NEET product is virtually identical in overall appearance to the ONE TOUCH product.

Whitehall claims that it made design changes in NEET sufficient to distinguish it from ONE TOUCH. The NEET container portion has a slightly flared bottom, whereas ONE TOUCH does not. The NEET container portion is rectangular in cross-section; ONE TOUCH is oval. The longitudinal edges of the NEET container portion have six ridges for grips on each side; the ONE TOUCH longitudinal edges are smooth. The NEET cylindrical roller at the top of the applicator is slightly longer than the ONE TOUCH roller. The ONE TOUCH roller has eleven parallel ridges along its surface; the NEET roller has thirteen slightly angled ridges. The NEET applicator portion and clear plastic cap are slightly squared in shape; the ONE TOUCH applicator portion and clear plastic cap are slightly rounded. The NEET container portion holds 5 fluid ounces of depilatory; the ONE TOUCH container portion holds 4.2 fluid ounces. The NEET roll-on is neither sold on a backing card nor presented for sale with any "temporary marketing device".

In early 1987, one of Inverness' sales managers learned that one of its customers would not purchase ONE TOUCH because the customer had purchased NEET from Whitehall, which it asserted was a better-known brand offered at a cheaper price. The following day, the same sales manager spoke to another of its customers, and obtained a selling sheet advertising Whitehall's new NEET roll-on. Approximately two weeks later, Inverness initiated this suit against Whitehall.

## DISCUSSION

■ It is the well-settled law of this Circuit that a party seeking a preliminary injunction must establish

both possible irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*Stormy Clime Ltd. v. Progroup, Inc.*, 809 F.2d 971, 973 (2d Cir.1987) (quoting *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985)). In order to establish a likelihood of success of the merits in a trade dress infringement action, the party seeking the injunction must show that

> the trade dress of its product has acquired secondary meaning in the marketplace and that the design of the competitor's product is confusingly similar to that of the plaintiff's product. Even if a manufacturer makes both of these showings, the competitor can prevail ... by showing that the similar arrangement of features is functional.

*Stormy Clime, supra*, 809 F.2d at 974 (citations omitted).

■ The trade dress of a product traditionally refers to a product's packaging or labeling, and "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics." *Stormy Clime, supra*, 809 F.2d at 974 (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983)). A product's trade dress has acquired secondary meaning "when the purchasing public associates that dress with a single producer or source rather than just with the product itself." *LeSportsac, Inc., supra*, 754 F.2d at 78. Evidence sufficient to establish secondary meaning may include evidence of sales success, substantial advertising expenditures, media coverage, third-party requests to license the use of a design, and deliberate attempts to imitate a trade dress design. *Id.* at 78; *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 949–50 (2d Cir.1981).

■ Inverness has presented sufficient evidence that the ONE TOUCH trade dress has acquired secondary meaning in the market place. Inverness presented evidence of ONE TOUCH's sales success in 1985 and 1986, and projected sales increases for 1987. While Inverness' advertising budget was not put into evidence, it did present examples of its print advertisements for ONE TOUCH placed in eight nationally distributed magazines, which amount to substantial advertising expenditures. In addition, Whitehall's inquiries regarding licensing the use of the ONE TOUCH design, and its subsequent deliberate attempt to imitate the ONE TOUCH trade dress design in its NEET roll-on depilatory provide further evidence that the ONE TOUCH design has acquired secondary meaning in the marketplace.

■ Inverness has likewise made a showing that Whitehall's NEET roll-on depilatory is confusingly similar to its ONE TOUCH depilatory. Apart from their labels, the ONE TOUCH and NEET roll-on depilatories are virtually identical. The packaging of each product consists of a flat, square-shaped white plastic container portion, a cylindrical white plastic roll-on applicator portion, and a clear plastic cap. While there are minuscule differences between the ONE TOUCH and NEET products, it is the "combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public." *Harlequin, supra*, 644 F.2d at 949 (quoting *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982)). I find that the ordinary consumer would not recognize the differences between the two products without specifically looking for them, and if she did, would be reasonably justified in believing that the two products emanate from the same source. In addition,

> [i]n assessing the likelihood of confusion to the public, an important factor is whether or not the second comer created the similar trade dress intentionally. If there was intentional copying the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded.

*Perfect Fit, supra*, 618 F.2d at 954. The facts in this case demonstrate that Whitehall deliberately imitated Inverness' ONE TOUCH trade dress in developing their NEET product. For the foregoing reasons, I find that Inverness has made a sufficient showing that NEET is confusingly similar to ONE TOUCH.

Whitehall asserts that the similar features of ONE TOUCH and NEET are functional, and therefore the NEET design does not infringe the ONE TOUCH trade dress. "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982).

A design feature of a particular article is "essential" only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough. An a design feature "affecting the cost or quality of an article" is one which permits the article to be manufactured at a lower cost, or one which constitutes an improvement in the operation of the goods.

*Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 331 (2d Cir.1983) (citations omitted).

The functions of the NEET and ONE TOUCH products are the storage of depilatory fluid and its application to the skin. The products at issue consist of three constituent parts: the clear plastic cap, the wide, cylindrical applicator portion, and the flat, square-shaped container portion. The clear plastic cap is most obviously nonfunctional; any shape, color, or configuration of cap would serve the function of covering and protecting the applicator. Transcript of Proceedings dated March 2, 1987 at 9. The flat, square-shaped container portion is also nonfunctional. Any shape, color, height, thickness, or configuration of container that would stand on a shelf and be held comfortably in hand could serve the function of holding the depilatory fluid. Transcript of Proceedings dated February 23, 1987 at 63–65. While the cylindrical applicator portion functions to apply the depilatory fluid directly to the skin, its shape and design are nonfunctional. The cylindrical roller-applicator need not be virtually identical to the ONE TOUCH roller in order to function. In addition, if the container and cap portions of the product were different from the ONE TOUCH, functional similarities between the two roller-applicators would not result in trade dress infringement of the product as a whole. No evidence has been presented to prove that any of the product features at issue affect the cost or quality of a roll-on depilatory. Therefore, I find that the similar features of the ONE TOUCH and NEET products are nonfunctional.

Finally, I find that Inverness faces possible irreparable injury and that the balance of hardships tips decidedly in its favor. "Likelihood of confusion is itself strong evidence that in the absence of an injunction [Inverness] might face irreparable harm." *LeSportsac, supra,* 754 F.2d at 79. Inverness would risk loss of both sales and goodwill if Whitehall were permitted to sell a confusingly similar product during the pendency of this action. Therefore, I find that the potential damage to Inverness' trade dress and goodwill in the absence of a preliminary injunction outweighs the temporary economic harm Whitehall may suffer.

In sum, the Order Granting Preliminary Injunction dated March 3, 1987 shall remain unchanged in accordance with these findings of fact and conclusions of law.

SO ORDERED.