**L. & J.G. STICKLEY, INC.,**
**Plaintiff–Appellee,**

v.

**CANAL DOVER FURNITURE CO., INC.**
**and Charles F. Kuder, Individually,**
**Defendants–Appellants.**

**No. 95, Docket 95–7715.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 31, 1996.

Decided March 21, 1996.

Ray L. Weber, Akron, OH (Sylvia A. Petrosky, Renner, Kenner, Greive, Bobak, Taylor & Weber; Dennis P. Hennigan, Peter D. Carmen, Mackenzie Smith Lewis Michell & Hughes, Syracuse, NY, of counsel), for Defendants–Appellants.

Susan E. Farley, Albany, N.Y. (Nicholas Mesiti, Heslin & Rothenberg, P.C., of counsel), for Plaintiff–Appellee.

Before OAKES and WINTER, Circuit Judges, and SAND,* District Judge.

OAKES, Senior Circuit Judge:

This appeal involves trade dress rights in furniture designs associated with Gustav Stickley, a leader of the early 20th century Arts & Crafts movement. Appellee L. & J.G. Stickley, Inc. ("L. & J.G. Stickley") brought suit against Appellant Canal Dover Furniture Co. and its president Charles F. Kuder (collectively referred to as "Canal Dover") for violation of § 43(a) of the Lanham Act, 15 U.S.C. 1125(a) (1994), and common law unfair competition and dilution. L. & J.G. Stickley claimed that certain pieces of Canal Dover furniture infringed upon the distinctive trade dress of L. & J.G. Stickley's Mission Collection furniture designs. The district court, Frederick J. Scullin, Jr., *Judge*, granted L. & J.G. Stickley a preliminary injunction on the basis of its Lanham Act claim. Specifically, the court found that (1) L. & J.G. Stickley was likely to succeed in proving at trial that there is protectible secondary meaning in the Mission Collection trade dress; and (2) a likelihood of confusion

exists between L. & J.G. Stickley's Mission Collection furniture and Canal Dover's furniture. Canal Dover appeals the preliminary injunction. For the reasons set forth below, we vacate the injunction and remand the case for trial.

## BACKGROUND

The Arts and Crafts movement, which rejected machine manufacturing and sought a return to craftsmanship, developed at the turn of the century in response to the Industrial Revolution. In the United States, one of the foremost promoters of the Arts and Crafts movement was Gustav Stickley, a furniture maker. The style of furniture made by Gustav Stickley and others in the movement is commonly called "Mission furniture" and is known for its "severely plain and rectilinear style . . . visually enriched only by expressed structural features and the warm tones of the wood." David M. Cathers, *Furniture of the American Arts and Crafts Movement* 1 (1981).

In 1916, Gustav Stickley closed down his Craftsman Shops and joined his brothers L. and J.G. Stickley in business at the Stickley Associated Cabinetmakers, which later became L. & J.G. Stickley, Inc. By 1920, the Arts and Crafts movement had lost its popularity and Mission-style furniture was no longer favored by consumers. L. & J.G. Stickley and other Mission furniture makers ceased production of the furniture in the 1920s. From that time until the 1980s, Mission furniture was not commercially successful, though it did gain a place in history books and museum collections. During this sixty-year period, L. & J.G. Stickley manufactured boat hulls, school desks, and copies of early American antiques.

In the 1980s, Mission furniture regained its popularity, with original pieces of Gustav Stickley furniture commanding extremely high prices at auctions. In 1989, L. & J.G. Stickley decided to capitalize on this renewed interest and began manufacturing its Mission Collection. Though several other craftsmen

---

* Honorable Leonard B. Sand, United States Senior District Judge for the Southern District of New York, sitting by designation.

were making reproductions of Gustav Stickley furniture at the time L. & J.G. Stickley entered the marketplace, L. & J.G. Stickley was the first company widely to commercialize the reproductions. Several pieces of the collection, including five at issue in this lawsuit, are line-by-line reproductions of Gustav Stickley. designs which L. & J.G. Stickley recreated by borrowing original pieces from collectors and museums. These reproductions clearly bear the L. & J.G. Stickley company mark alongside the old Stickley mark on the underside of the furniture. The Mission Collection pieces are high quality, distinguished reproductions aimed at the expensive end of the furniture market.

Other furniture companies also sought to profit from "Mission mania." In April 1993, Canal Dover began manufacturing its Stillwater Collection of Mission-style furniture and expanded its line in 1994 with the Stonehouse Collection. Canal Dover derived the designs of several pieces of its Stillwater and Stonehouse lines, including those at issue in this lawsuit, from furniture design history books. In particular, Canal Dover chose to produce versions of the Gustav Stickley Spindle Chair and a chair designed by Harvey Ellis, a furniture maker at Gustav Stickley's Craftsman Shops. Although Canal Dover was aware that L. & J.G. Stickley was making Gustav Stickley reproductions, it did not take its designs from the Mission Collection nor did it seek to produce exact line-by-line pieces as L. & J.G. Stickley did. The Canal Dover pieces, while of good quality, are lower priced than L. & J.G. Stickley's pieces. Each Canal Dover piece clearly bears the company's mark on the underside of the furniture.

L. & J.G. Stickley discovered the Canal Dover Stillwater Collection when some of the pieces appeared on the March 17, 1995, cover of *Furniture Today*. It became aware of the Canal Dover Stonehouse Collection on April 3, 1995, when one of its vice presidents saw an unfinished Canal Dover piece while visiting the factory of Fancher Chair Co., the company with which Canal Dover had con-

tracted to produce certain pieces of the Stonehouse Collection. L. & J.G. Stickley instituted this action on April 11, 1995, claiming that several pieces of Canal Dover's Stillwater and Stonehouse lines looked too similar to six L. & J.G. Stickley pieces: the Spindle Arm Chair, the Spindle Settee, the Spindle Side Chair, the Harvey Ellis Arm Chair, the Harvey Ellis Side Chair, and the Prairie Sideboard. All of these pieces are Gustav Stickley reproductions except the Prairie Sideboard.

The district court entered a preliminary injunction in favor of L. & J.G. Stickley, based on its Lanham Act claim, against each piece of Canal Dover furniture except the Stonehouse Arm Chair, which the court found was sufficiently dissimilar to the Harvey Ellis Arm Chair to not infringe upon L. & J.G. Stickley's trade dress.[1] The court ordered L. & J.G. Stickley to post a $100,000 bond to secure the preliminary injunction.

## DISCUSSION

Canal Dover raises a variety of claims on appeal. Among them is the novel question of whether the trade dress of reproductions can gain secondary meaning which identifies and protects the reproducer. Canal Dover claims that the court erred in finding that L. & J.G. Stickley's Mission Collection of historic reproductions developed secondary meaning from their initial marketing in 1989 until the early 1990s when other furniture manufacturers began selling reproductions. We agree with Canal Dover's contention and vacate the preliminary injunction on that ground. We therefore do not address Canal Dover's other claims.

## I. STANDARD FOR A PRELIMINARY INJUNCTION

In order to receive a preliminary injunction, a party must demonstrate (1) that it will suffer irreparable harm if the preliminary injunction is not issued, and (2) that it is likely to succeed on the merits of its claims or, in the alternative, has demonstrated sufficiently serious questions regarding the mer-

1. The Fancher Chair Co. manufactured the Stonehouse Arm Chair after agreeing with Canal Dover on design modifications that adequately distinguished the chair from L. & J.G. Stickley's Harvey Ellis Arm Chair, which Fancher Chair Co. also manufactured.

its of the claims and the balance of hardships tips decidedly in its favor. *Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 967 (2d Cir.1995); *Jackson Dairy, Inc., v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). We review the district court's issuance of a preliminary injunction for abuse of discretion. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir.1995). "A failure to consider relevant factors or to apply the proper legal standard constitutes such an abuse." *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 973–74 (2d Cir.1987).

The district court found that L. & J.G. Stickley would suffer irreparable harm without an injunction and was likely to succeed on the merits of its § 43(a) claim. We must therefore turn to the Lanham Act to evaluate the district court's decision.

## II. THE LANHAM ACT

Section 43(a) of the Lanham Act prohibits any person from using "any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his or her goods." 15 U.S.C. § 1125(a)(1)(A) (1994).

As we have explained elsewhere, this section gives a statutory remedy to a party injured by another's "false designation of origin" whether or not the party has secured a federal·registered trademark for the item at issue. *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 75 (2d Cir.1985). Although trade dress once "referred only to the manner in which a product was 'dressed up' to go to market with a label, package, display card, and similar packaging elements," the concept now "includes the design and appearance of the product as well as that of the container." *Jeffrey Milstein, Inc.,* 58 F.3d at 31. It is "essentially [the] total image and overall appearance" of a product. *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 764 n. 1, 112 S.Ct. 2753, 2755 n. 1, 120 L.Ed.2d 615 (1992)).

In order to prevail on a trade dress claim under § 43(a) of the Lanham Act, a party must first show that the trade dress is inherently distinctive or has become distinctive because it has acquired secondary meaning. *Tough Traveler, Ltd.,* 60 F.3d at 967. If the trade dress at issue is found to be distinctive, a party then must demonstrate that there exists a likelihood of confusion between its product and the alleged infringer's product.[2] *Id.* Thus, the threshold inquiry is distinctiveness: whether the trade dress identifies the producer. As the Restatement notes, "[t]he imitation or even complete duplication of another's product or packaging will not create a risk of confusion unless some aspect of the duplicated appearance is identified with a particular source." *Restatement (Third) of Unfair Competition* § 16 cmt. a (1995).

A trade dress may identify the producer in one of two ways: a product either may be inherently distinctive or it may acquire distinctiveness by gaining in the mind of consumers a secondary meaning associating the trade dress with the product's source. *Two Pesos,* 505 U.S. at 769, 112 S.Ct. at 2757–58. An inherently distinctive trade dress is one that is "likely to serve primarily as a designator of origin of the product," *Knitwaves, Inc. v. Lollytogs Ltd., Inc.,* 71 F.3d 996, 1008 (2d Cir.1995) (quoting *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1449 (3d Cir.1994)), taking into account "the nature of the designation and the context in which it is used." *Restatement (Third), supra,* § 13(a); *see also* 1 J. McCarthy, *Trademarks & Unfair Competition* § 8.02[4] (3d ed.1994) (inherent distinctiveness determined by "whether the design, shape or combination of elements is so unique, unusual or unexpected in th[e] market that one can assume without proof that it will automatically be perceived by customers as an indicia of origin.")

Here, the district court properly declined to analyze L. & J.G. Stickley's trade dress under the rubric of inherent distinc-

---

**2.** The likelihood of consumer confusion also tends to prove irreparable harm. *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988). Because we are vacating the preliminary injunc-

tion on the ground of secondary meaning, however, we do not need to address the district court's finding of irreparable harm in this case.

tiveness. L. & J.G. Stickley has "reissued," in its word, exact copies of Gustav Stickley designs. By definition, these exact copies of Gustav Stickley designs cannot primarily designate L. & J.G. Stickley. *See EFS Marketing, Inc. v. Russ Berrie & Co., Inc.,* 76 F.3d 487, 491–92 (2d Cir.1996) (trade dress in troll doll design is not "likely to serve as a designator of origin of the product" because the plaintiff's dolls, as well as similar troll dolls on the market, replicate a 1960s troll doll design by a Danish woodcarver). Unless a consumer were to inquire, or turn a piece of furniture upside down and search for the trademark, the L. & J.G. Stickley reproduction would look just like an original Gustav Stickley piece that commands hundreds of thousands of dollars in the antiques marketplace. Such a trade dress cannot serve primarily to designate L. & J.G. Stickley as the source of the product and thus cannot be inherently distinctive.[3]

The district court instead correctly inquired whether L. & J.G. Stickley's trade dress has acquired secondary meaning. Secondary meaning refers to "a subsequent significance added to the original meaning" of the trade dress due to a producer's use of it. *Restatement (Third), supra,* § 13 cmt. e. In order to prove at trial that its trade dress has attained secondary meaning, L. & J.G. Stickley would have to show that, over time, the trade dress has become identified with its producer in the minds of potential consumers.

The district court found that L. & J.G. Stickley was likely to succeed in proving that its Mission Collection furniture had acquired a secondary meaning in the minds of consumers. In reaching this conclusion, the district court applied the factors set forth in *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1222 (2d Cir.1987), which include: "(1) advertising

expenditures, (2) consumer studies linking the dress to the source,[4] (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the [dress]'s use." As we noted in *Centaur,* though "no 'single factor [is] determinative,' and [ ] every element need not be proved," *id.* (quoting *Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 217 (2d Cir.1985)), these factors serve to focus the inquiry on the perception of the "consuming public." *Id.* at 1221. Canal Dover asserts that the district court erred in weighing these factors in favor of L. & J.G. Stickley. We agree.

Canal Dover argues that L. & J.G. Stickley has abandoned its rights in the trade dress because production of the designs ceased in the early 1920s. It claims that the designs, now featured in museums, history books, and auctions, are, in its words, "dedicated to the public." Canal Dover fails to provide a precise legal argument to advance this position no doubt because the facts of this case are unusual and the law has yet to provide reliable instruction. Their contention, however, reminds us of the law of registered trademark cancellation, and we find a comparison to that area of law helpful to the resolution of this case.

Section 14 of the Lanham Act, 15 U.S.C. § 1064 (1994), allows a party to seek cancellation of an abandoned registered trademark. An abandoned trademark is one whose "use has been discontinued with intent not to resume such use" or has "become the generic name for the goods or services on or in connection with which it is used or otherwise ... [has lost] its significance as a mark" because of "any course of conduct of the owner." 15 U.S.C. § 1127 (1994). Once a registered trademark has been abandoned, any subsequent user of the mark must measure its rights from the time the subsequent

---

3. In *Imagineering, Inc. v. Van Klassens, Inc.,* 53 F.3d 1260 (Fed.Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995), the Federal Circuit, applying Second Circuit law, found Imagineering's trade dress in its Weatherend line of furniture inherently distinctive. The Weatherend line was inspired by "chairs and tables created by architect Hans Heistad in 1913 for a Maine estate called Weatherend." *Id.* at 1262. We believe that the *Imagineering* case does not pres-

ent a correct analysis of inherent distinctiveness because the court did not question which origin the product's trade dress designated: Heistad, the creator, or Imagineering, the reproducer.

4. As the district court noted, neither party produced evidence of consumer studies on the issue of secondary meaning.

use begins, and cannot rely upon any residual secondary meaning in the mark from the original period of use. This is true even if it is the original mark holder that resumes use of the abandoned trademark. *See Restatement (Third), supra,* § 30 cmt. a; *Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd.,* 817 F.Supp. 1103, 1131–33 (S.D.N.Y.1993), *vacated pursuant to settlement,* 859 F.Supp. 80 (S.D.N.Y.1994).

 Here, the designs of Gustav Stickley were not produced from the early 1920s until 1989. In the parlance of registered trademark cancellation law, L. & J.G. Stickley abandoned its trade dress during this period of time. The over sixty years of non-use of the trade dress, during which time L. & J.G. Stickley manufactured boat hulls and early American reproductions, extinguished any rights L. & J.G. Stickley had in the Gustav Stickley designs.[5] Although L. & J.G. Stickley resumed use of the trade dress in 1989 when it began to "reissue" the Gustav Stickley furniture designs, L. & J.G. Stickley was not entitled to benefit from any use of the trade dress prior to 1989.

The fact that L. & J.G. Stickley shares a name with Gustav Stickley does not alter our analysis. The district court recognized this when it declined to consider any evidence of secondary meaning from the period of time prior to L. & J.G. Stickley's "reissuing" of the Gustav Stickley designs in 1989. To this extent, the district court's secondary meaning analysis is correct.

 However, the district court failed to acknowledge the significant impact on a secondary meaning analysis which occurs where the party seeking Lanham Act protection has resumed manufacture of a product of historical significance, which it had discontinued for many years, until public interest in the original product revived. L. & J.G. Stickley did

not simply resume use of an abandoned trade dress long since forgotten by the public. Rather, Gustav Stickley's original pieces have captured the public's imagination, earning a place in museums and history books, and commanding high bids at auctions. Though L. & J.G. Stickley used the same designs and craftsmanship in developing its Mission Collection that Gustav Stickley did in creating the originals, the L. & J.G. Stickley reproductions are *not* the same product as the originals.[6]

This case is similar to our recent opinion in *EFS Marketing, Inc. v. Russ Berrie & Co., Inc.,* 76 F.3d 487 (2d Cir.1996) where we considered trade dress protection for a "troll doll." Troll dolls were first introduced into the United States in the 1960s by a Danish woodcarver, Thomas Dam, and regained popularity in the 1980s. Starting in 1982, EFS Marketing distributed troll dolls made by the Danish company that had first introduced the dolls to the United States in the 1960s. Russ Berrie began producing a similar line of troll dolls in 1990. Commenting on EFS's failure to assert secondary meaning in the troll doll trade dress, the court noted, "[i]n view of the district court's finding that 'both parties' dolls [are] virtually indistinguishable from the 1961 public domain doll,' . . ., it is most unlikely that consumers would look to EFS as the sole producer of the troll dolls at issue." *Id.* at 490.

As in *EFS Marketing,* we doubt that consumers have come to associate exact reproductions of Gustav Stickley designs with L. & J.G. Stickley. The district court failed to address the difficulty L. & J.G. Stickley faces in establishing that consumers identify the Mission Collection trade dress with L. & J.G. Stickley rather than with the maker of the popular originals. Given this difficulty, we believe it unlikely that L. & J.G. Stickley will succeed on the merits of its Lanham Act

---

5. In this respect, our case is different from *Ferrari S.P.A. Esercizio v. Roberts,* 944 F.2d 1235 (6th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). There, the court found that even though Ferrari had ceased production of its 365 GTB/4 Daytona in 1974, the car design maintained secondary meaning in the eyes of the public because Ferrari continued to design cars with a very similar appearance and continued to manufacture parts for 365 GTB/4 Daytona owners.

6. The Prairie Sideboard apparently is not a Gustav Stickley design, and therefore is not covered by our holding here. The issue of infringement of the Prairie Sideboard was raised by L. & J.G. Stickley for the first time at the preliminary injunction hearing. On remand, the district court should consider the Sideboard's trade dress separately in determining whether L. & J.G. Stickley should prevail on its Lanham Act claim as to that piece.

claim. We therefore find that the court abused its discretion in awarding L. & J.G. Stickley a preliminary injunction.

We realize that the facts of this case are rare. Faced with a lack of similar precedents, the district court applied the standard *Centaur Communications* formula to determine secondary meaning. The ultimate goal of the *Centaur Communications* factors, however, is to ascertain whether the consuming public has come to associate the trade dress at issue primarily with the producer. In a case of exact reproductions of historical designs, we think that such an association presents a high hurdle to a Lanham Act plaintiff. It is a hurdle that we do not believe L. & J.G. Stickley will clear.

## CONCLUSION

Because we find that L. & J.G. Stickley is not likely to succeed in proving secondary meaning and that the district court failed to distinguish properly between Gustav Stickley and L. & J.G. Stickley when analyzing secondary meaning, we vacate the preliminary injunction and remand the case for trial.

WINTER, Circuit Judge, concurring in the result:

Given the need for expedition, I will limit my concurrence to a brief summary of my views. I concur in all of Judge Oakes' opinion except for the portion analogizing the case before us to cancellation or abandonment of a trademark.

Judge Oakes is, in my view, completely correct in noting that the Stickley originals and the Stickley reproductions are different products that sell at different prices to different consumers. The originals are antiques. They command higher prices than is charged for the reproductions and are sold largely to purists for whom only the original will do. Indeed, there is evidence in the record of a retailer altering identification of a reproduction in the hope of selling it as an original.

The originals are, of course, associated in consumers' minds with Gustav Stickley, but that secondary meaning is of no legal usefulness to the plaintiff, Gustav's successor-in-interest, because by definition production of the original items took place generations ago, whereas trade dress protection is sought for items coming out of the factory at this very moment.

Reproductions are generally not thought of by consumers as being produced by the original designer or artist, at least when the creation of the original and the reproduction are separated by sixty years, as in this case. Plaintiff's case for secondary meaning is stronger than that of many who reproduce designs or artworks because it was the sole large-scale commercial reproducer of Stickley-designed furniture for two years. However, there is nothing in the record suggesting that the reproductions acquired secondary meaning in that short period of time.

Because I think that the lack of proof regarding secondary meaning associated with reproductions is dispositive of the present proceeding, I see no reason to address the application by analogy of trademark cancellation law or abandonment to the present facts.