## MECHANICAL PLASTICS CORP., Plaintiff,

v.

## TITAL TECHNOLOGIES, INC., Petersen Products, Inc. and Danish Import, Inc., Defendants.

### No. 92 Civ. 5123 (CLB).

United States District Court, S.D. New York.

June 17, 1993.

Howard Aronson and Mark Ingber, Lackenbach, Siegel, Marzullo, Aronson & Greenspan, P.C., Scarsdale, NY, for plaintiff.

Edward B. Hunter, Nolte, Nolte & Hunter, P.C., Jericho, NY, Robert L. Kelly, Dykema Gossett, Bloomfield Hills, MI, for defendants.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

At the July 15, 1992 preliminary injunction hearing in this action to enjoin a trademark violation, the plaintiff and the defendants consented to a consolidated trial on the merits, to be held in October, 1992. *See* Transcript (document no. 26), pp. 13–17. Nevertheless, on September 30, 1992, defendant

Titan Technologies, Inc. ("Titan") filed this motion for partial summary judgment (document no. 20), pursuant to F.R.Civ.P. Rules 56 and 54(b), on its counterclaim that one of the trademarks asserted by the plaintiff in this trademark infringement litigation is invalid because it is functional. By the Answer and Counterclaims dated October 19, 1992, and filed October 26, 1992 (document no. 29), defendants Petersen Products, Inc. and Danish Import, Inc. are deemed to join in the motion. The parties all have filed numerous supplemental papers, before and after the motion was heard on November 10, 1992.

Immediately following the hearing, the parties requested that the Court hold the motion in abeyance while they attempted to settle the litigation. On February 1, 1993, a letter brief (document no. 38), dated January 28, 1993, from plaintiff Mechanical Plastics Corp. ("Mechanical Plastics") was filed in response to Titan's January 25, 1993 letter (document no. 37), and Supplemental Affidavit (document no. 36). The motion was fully submitted for decision as of February 1, 1993. On March 17, 1993, the counsel for the plaintiff telephoned chambers to advise that they were considering filing still more papers. By letter dated March 18, 1993, the plaintiff informed the Court that it had decided *not* to file additional documents lest our decision be delayed. The matter is now ripe for decision, and is resolved as follows.

### PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Mechanical Plastics filed this action on July 9, 1992, charging the defendants with four counts: (I) false designation of origin and trademark infringement, in violation of the Lanham Act, 15 U.S.C. §§ 1125(a)(1) and (2); (II) trafficking in counterfeit goods, in violation of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and (b); (III) state trademark infringement; and (IV) unfair competition, and dilution, in violation of New York General Business Law § 368-d. This Court is asked to exercise its supplemental jurisdiction over the pendent New York State claims. The plaintiff seeks a permanent injunction, an accounting of the defendants' profits, and monetary damages.

The facts set forth below are either conceded, or assumed for the purpose of the motion. Plaintiff Mechanical Plastics is "engaged in the business of manufacturing, promoting and selling plastic screw anchors, under various trademarks including the trademark 'Toggler.'" Complaint ¶ 8. The plaintiff claims to own two registered trademarks consisting of a representation of the side-view silhouette of a particular screw anchor (the "Toggler"). The plaintiff has identified these two trademarks throughout its papers as "Trademark A" (issued U.S. Reg. No. 1,248,999 on August 23, 1983) and "Trademark B" (issued U.S. Reg. No. 1,510,979 on November 1, 1988). Complaint ¶¶ 10, 12. The validity of Trademark A has not been challenged by the defendants.

Defendant Titan has filed a counterclaim seeking a declaratory judgment that Titan's product does not infringe either Trademark A or Trademark B. The defendants contend that what the plaintiff has designated as Trademark B is not a valid trademark. Trademark B has not been used continuously and exclusively for the five year statutory period, pursuant to 15 U.S.C. § 1065. The defendants seek to have this Court order the United States Patent and Trademark Office to cancel the mark administratively, pursuant to 15 U.S.C. § 1064 and 15 U.S.C. § 1119. In Titan's Answer, filed on August 31, 1992, the defendants allege that "Trademark B" is not a trademark, and cannot function as such, thus it cannot be infringed. *See* document no. 14. The defendants claim that "the configuration of the goods depicted in Exhibit B does not function as a trademark and is incapable of having good will attendant therewith." Answer (document no. 14), ¶ 11. The defendants assert that "the configuration of the goods is totally functional" and that the "basic utilitarian design features ... leav[e] no acceptable alternative designs for competitive products." Answer (document no. 14), ¶¶ 48, 49. The defendants assert that Mechanical Plastics' design features are essential because they "affect[ ] the cost and quality of the anchor." Answer (document no. 14), ¶ 50. *See also Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982).

The defendants also assert, as an affirmative defense, the equitable doctrine of "unclean hands." The defendants claim that the design features of Trademark B were the "subject matter of United States Letters Patent 3,651,734 [a *product* patent] which issued to the plaintiff on March 28, 1972 and which expired on March 28, 1989." Answer (document no. 14), ¶ 52. The defendants allege that the plaintiff's attempt to assert its registered Trademark B unlawfully "constitutes an attempt to extend its monopoly under U.S. Patent 3,651,734." Answer (document no. 14), ¶ 53. The Answer and Counterclaims dated October 19, 1992, and filed October 26, 1992 by defendants Petersen Products, Inc. and Danish Import, Inc. essentially are to the same effect as the Titan Answer. *See* document no. 29.

In addition to the counterclaim seeking a declaratory judgment, the defendants allege two counts of unfair competition against the plaintiff. The first, on the theory of tortious interference, is based on warning letters sent by plaintiff Mechanical Plastics' counsel to the defendants' customers. The defendants allege that the plaintiff caused its own counsel to make several misrepresentations including, *inter alia*, that the "Longhorn" anchor sold by defendants infringes certain Japanese patents held by Mechanical Plastics. The second is based on a theory of "trademark misuse." The defendants allege that the plaintiff tried impermissibly to extend the grant of its patent monopoly, based on the '734 patent, by claiming trademark protection for the identical functional elements of the Toggler plastic wall anchor which were protected by the patent until it expired, on March 28, 1989.

The now-expired patent referred to, United States Patent No. 3,651,734 ("the '734 patent"), was the first of many patents in this very crowded field of art assigned to Mechanical Plastics by inventor Thomas W. McSherry during—and after—the time that he worked for Mechanical Plastics designing plastic wall anchors to hold screws. In late 1974 or early 1975, inventor McSherry had been fired from Mechanical Plastics. *See Mechanical Plastics Corp. v. Thaw,* 197 U.S.P.Q. (B.N.A.) 651 (N.Y.Sup.Ct.1977).

Soon thereafter, Mr. McSherry had been re-hired as an "exclusive consultant," until terminated again on June 3, 1991. At some time in the early to mid–1980s, Mr. McSherry began designing plastic wall anchors for the Rawlplug Company, a competitor of Mechanical Plastics, for whom Mr. McSherry was, at that time, employed as exclusive consultant. Judge Knapp, of this district, noted that McSherry was trying to "invent around" his own patent, which he previously had assigned to Mechanical Plastics. *Mechanical Plastic Corp. v. The Rawlplug Co.,* 14 U.S.P.Q.2d (B.N.A.) 1058, 1989 WL 149285 (S.D.N.Y.1989). Mr. McSherry is now the principal of defendant Titan.

Plaintiff alleges, and defendants do not deny, that Mr. McSherry was terminated on June 3, 1991, "because of evidence which had arisen which indicated that Mr. McSherry's son had been soliciting business from one of plaintiff's largest customers for an anchor, the specifications of which exactly matched those specified by the customer to the plaintiff and conveyed to Mr. McSherry ['... in trust and under contract ...'] for product development." Plaintiff's Memorandum in Opposition to Defendant Titan's Motion for Partial Summary Judgment, filed November 4, 1992 (document no. 30), at p. 9, citing Declaration of Nathaniel Garfield, filed November 4, 1992 (document no. 32), ¶ 22.

Mechanical Plastics, Nathaniel Garfield, Mr. McSherry, and his one-time colleague, Louis Giannuzzi, have been involved in litigation over these patented and trademarked screw anchors for more than a decade. This litigation has produced the following published opinions: *McSherry v. Giannuzzi,* 717 F.Supp. 238 (S.D.N.Y.), *appeal denied,* 889 F.2d 1098 (Fed.Cir.1989); *Mechanical Plastics Corp. v. Unifast Indus., Inc.,* 657 F.Supp. 502 (E.D.N.Y.1987), *aff'd,* 846 F.2d 78 (Fed.Cir.1988) (Table, Text in WESTLAW); *Mechanical Plastics Corp. v. Unifast Indus., Inc.,* 610 F.Supp. 1073 (E.D.N.Y. 1985); *McSherry v. Giannuzzi,* 227 U.S.P.Q. (B.N.A.) 868 (Bd. of Pat.App. & Int. 1985), *aff'd,* 790 F.2d 95 (Fed.Cir.1986) (Table, Text in WESTLAW); and two New York State Court cases, *Mechanical Plastics Corp. v. Rawlplug Co.,* 119 A.D.2d 641, 501 N.Y.S.2d

85 (1986); *Mechanical Plastics Corp. v. Thaw,* 197 U.S.P.Q. (B.N.A.) 651 (N.Y.Sup. Ct.1977).

During all relevant times when Trademark B was applied for, first examined and rejected, and subsequently published and registered, Thomas W. McSherry was the "exclusive consultant" to Mechanical Plastics. McSherry Affidavit, filed September 30, 1992 (documents no. 20 and 23), ¶ 7, at p. 4. In his sworn affidavit, he has declared that he was Mechanical Plastics' only technical expert. It is a reasonable inference, therefore, that he assisted during the mid–1980's in the prosecution of Trademark B. The purpose of seeking Trademark B was to extend trademark protection to the Toggler plastic wall anchor, Mr. McSherry's seminal invention, as embodied in the '734 patent, which was procured in 1972 while Mr. McSherry was a full-time employee of Mechanical Plastics. Mr. McSherry, however, is not referenced anywhere in the Patent and Trademark Office prosecution history of Trademark B, the '979 trademark.

### THIS CASE IS CONTROLLED BY THE CASELAW OF THE SECOND CIRCUIT

■ The plaintiff is mistaken as to the proper source of the caselaw which this Court must follow. The plaintiff has written: "By choosing to proceed to cancel Plaintiff's issued Registration, *Titan subjected itself and this Court to the law applied by* the United States Patent and Trademark Office, its reviewing Board, the Trademark Trial and Appeal Board (TTAB) and that Board's exclusive Court of Appeals, *the United States District [sic] Court for the Federal Circuit.*" Plaintiff's Memorandum in Opposition to Defendant Titan's Motion for Partial Summary Judgment, filed November 4, 1992 (document no. 30), at p. 25 (emphasis added). For that proposition, plaintiff in footnote number 32, cites 15 U.S.C. §§ 1067, 1071(a)(1). This case is *not* controlled by 15 U.S.C. § 1071(a)(1), because it is *not* an appeal to the Federal Circuit from the United States Patent and Trademark Office Trademark Trial and Appeal Board. *See* Complaint ¶ 7, at p. 2. Nor is it controlled by 15 U.S.C.

§ 1071(*b*), the *correct* section for actions in the district courts following a decision of the Trademark Trial and Appeal Board. "An applicant for registration or party to an opposition or cancellation proceeding disappointed with the decision of the TTAB may either appeal the decision to the United States Court of Appeals for the Federal Circuit, 15 U.S.C. § 1071(a), or bring a civil action in a United States District Court, 15 U.S.C. § 1071(b)." *Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 852 (2d Cir.1988). In this case, rather, the counterclaim for cancellation is founded upon 15 U.S.C. § 1119. *See Gear, Inc. v. L.A. Gear California, Inc.,* 670 F.Supp. 508 (S.D.N.Y. 1987); *see also W & G Tennessee Imports, Inc. v. Esselte Pendaflex Corp.,* 769 F.Supp. 264 (M.D.Tenn.1991). This Court's jurisdiction of the original action and the counterclaim is conferred pursuant to 15 U.S.C. § 1121(a): "The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States (*other than the United States Court of Appeals for the Federal Circuit*) shall have appellate jurisdiction, of actions arising under this chapter." *Id.* (emphasis added).

In further support of its erroneous contention, the plaintiff also cited *Van Dyne–Crotty, Inc. v. Wear–Guard Corp.,* 926 F.2d 1156, 1158 (Fed.Cir.1991). That case stands for the proposition that, pursuant to 28 U.S.C. § 1295(a)(4)(B), the United States Court of Appeals for the Federal Circuit has exclusive appellate jurisdiction over the Trademark Trial and Appeal Board. *Id.* While that is true, the Federal Circuit does not have exclusive jurisdiction over appeals from the district courts in trademark cases, in the way that it does over appeals in patent cases. *See* 28 U.S.C. § 1295(a)(1). The Supreme Court has held that: "Congress ... granted jurisdiction to the Federal Circuit over 'an appeal from ... a district court ... if the jurisdiction of that court was based ... on [28 U.S.C.] section 1338'.... In view of that clear congressional intent, we have no more authority to read § 1295(a)(1) as granting the Federal Circuit jurisdiction over an appeal where the well-pleaded complaint does not depend on patent law, than to read § 1338(a) as granting a district court jurisdiction over

such a complaint." *Christianson v. Colt Indus. Op. Corp.,* 486 U.S. 800, 813–14, 108 S.Ct. 2166, 2176, 100 L.Ed.2d 811 (1988). The Supreme Court, in *Christianson v. Colt,* vacated the Federal Circuit's twenty-three page advisory decision on the merits by then Chief Judge Markey, and remanded the case to the Seventh Circuit, because that was the *correct* appellate court. *Id.,* 486 U.S. at 818, 108 S.Ct. at 2178 (citing *Sheldon v. Sill,* 49 U.S. (8 How.) 441, 449, 12 L.Ed. 1147 (1850) ("Courts created by statute can have no jurisdiction but such as the statute confers.")).

Trademark cases, such as this, are federal question cases, and are within the original jurisdiction of the United States District Courts. 15 U.S.C. § 1121(a); *Huber Baking Co. v. Stroehmann Bros. Co.,* 252 F.2d 945 (2d Cir.), *cert. denied,* 358 U.S. 829, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958). They are controlled by the caselaw of the United States Supreme Court and of the Circuit Court of Appeals in which the district court sits. *Id.; Montres Rolex, S.A. v. Snyder,* 718 F.2d 524, 529 (2d Cir.1983), *cert. denied sub nom., Grand Jewels, Inc. v. Montres Rolex, S.A.,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

### PROTECTION OF INTELLECTUAL PROPERTY

Ideas are not property. Ideas belong to the world and to all humanity, and may not be owned by any one person. One may never protect an idea itself. "An idea of itself is not patentable, but a new device by which it may be made practically useful is." *Rubber–Tip Pencil Co. v. Howard,* 87 U.S. (20 Wall.) 498, 507, 22 L.Ed. 410 (1874); *see also Diamond v. Diehr,* 450 U.S. 175, 185, 101 S.Ct. 1048, 1056, 67 L.Ed.2d 155 (1981) (citing cases). Accordingly, Congress has authorized the protection of the embodiment of an idea, the expression of an idea, a process, a design, or a product.

■ A product's different aspects can be protected simultaneously by more than one of the statutory means for the protection of intellectual property. *See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 154, 165–67, 109 S.Ct. 971, 979, 985–86, 103 L.Ed.2d 118 (1989) (patent laws do not conflict with trademark protection and unfair competition laws); *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476–478, 94 S.Ct. 1879, 1883–84, 40 L.Ed.2d 315 (1974) (recognizing that patent protection extends to elements not protected adequately by copyright); *Application of Mogen David Wine Corp.,* 328 F.2d 925, 930 (C.C.P.A.1964) (Trademark rights that happen to continue beyond the expiration date of a patent on the same product do *not* extend the patent grant, because the two forms of protection "exist independently ... under different law and for different reasons."); *In re Yardley,* 493 F.2d 1389, 1394 (C.C.P.A.1974) ("Congress has not provided that an author-inventor must elect between securing a copyright or securing a design patent," so the court allowed both forms of protection to stand.); Einhorn, *Copyright and Patent Protection for Computer Software: Are They Mutually Exclusive?,* 30 Idea: J.L. & Tech. 265 (1990) (comprehensive article collecting cases), *reprinted in* Milgrim, *Milgrim on Trade Secrets,* App. (1991); *see also Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 172 (2d Cir.1991) (Winter, C.J., concurring in part and dissenting in part) (there are "fine but important distinctions between the legal protections offered by design patents, copyrights and trademarks"); *see generally* Dratler, *Trademark Protection for Industrial Designs,* 1988 U.Ill.L.Rev. 887, 922–24, 936–37 (1988).

For example, two of the several means by which a product may be protected from competitors are a patent and a trademark. Each method is designed to protect different intellectual aspects or attributes of the product. In *Application of Mogen David Wine Corp.,* 328 F.2d 925 (C.C.P.A.1964), the old Court of Customs and Patent Appeals permitted the applicant *to seek* trademark protection for the configuration of a decanter bottle that was contemporaneously being protected by a design patent. The court wrote: "When the patent ... ends, it ends.... We know of no provision of patent law, statutory or otherwise, that guarantees to anyone an absolute right to copy the subject matter of an expired patent. Patent expiration is nothing more than the cessation of the patentee's right to exclude held under the patent law."

*Id.*, 328 F.2d at 931. The Court of Appeals for the Federal Circuit held that the expiration of the design patent protection on the invention cannot terminate a valid trademark for the *distinctive portion* of the invention that is intended primarily to identify the *source* of the product. The *Mogen David* doctrine arose, however, in the context of a *design patent*, not an ordinary invention that is useful in commerce and industry such as a wall screw anchor. In fact, in a subsequent opinion, the Court of Customs and Patent Appeals affirmed the decision of the Trademark Trial and Appeals Board *not* to allow the Mogen David Wine Corporation to register the design of its decanter bottle as a trademark, because it was functional, and therefore, ineligible for trademark protection. *See Application of Mogen David Wine Corp.*, 372 F.2d 539, 541–42 (C.C.P.A.1967).[1]

A patent is a grant by the United States, pursuant to the Constitution, of a limited monopoly, for a term of seventeen years, within which time the patentee has the "right to exclude others from making, using, or selling the invention." 35 U.S.C. § 154. A product patent, such as the now-expired '734 patent, is designed to protect an invention that is novel, non-obvious, and useful. 35 U.S.C. §§ 101, 102, and 103. At the end of the seventeen year grant, the invention enters the public domain, and the art can be practiced by anyone; this to fulfill the constitutional objective to "promote the Progress of Science and useful Arts, by securing for limited Times to ... Inventors the exclusive Right to their ... Discoveries." U.S. Const. art. I, § 8, cl. 8. *See also Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977–78 (2d Cir.1987).

## TRADEMARK PROTECTION

■ A trademark is designed to identify the origin and source of goods, to assure consistency of quality on repeat purchases, and to serve as an advertisement by which a manufacturer can bypass individual retailers to reach consumers directly. *See generally*

Schechter, *The Rational Basis of Trademark Protection,* 40 Harv.L.Rev. 813 (1927). The trademark laws are designed, in part, to protect the marketer who owns the trademark, but the *overriding* concern has always been to protect the purchasing public from confusing the product it desires to purchase with a similar product from a different source. *United States v. Hon,* 904 F.2d 803, 806 (2d Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 789, 112 L.Ed.2d 851 (1991).

Ownership of a trademark originated with state statutes and the common law and is obtained through use in the marketplace. "The trade-mark recognized by the common law is generally the growth of a considerable period of use, rather than a sudden invention.... The trade-mark may be, and generally is, the adoption of something already in existence as the distinctive symbol of the party using it. At common law the exclusive right to it grows out of its *use,* and not its mere adoption.... It is simply *founded on priority of appropriation....* If the symbol, however plain, simple, old, or well-known, has been first appropriated by the claimant as his distinctive trade-mark, he may by registration secure the right to its exclusive use." *Trade–Mark Cases,* 100 U.S. 82, 94, 25 L.Ed. 550 (1879) (emphasis in original).

Since 1947, the federal law concerning trademarks has been The Lanham Act, 15 U.S.C. § 1051 *et seq.*, as modified by caselaw, and The Trademark Revision Act of 1988, which took effect on November 16, 1989. Controversies concerning trademarks may properly be tried in a United States District Court. 28 U.S.C. § 1338; 15 U.S.C. § 1121(a). The United States Supreme Court has held that the purpose of the Lanham Act is to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation." *Park 'N Fly, Inc. v. Dol-*

---

1. The opinions of the Court of Customs and Patent Appeals in the *Mogen David* cases display a line drawing of a wine bottle, which may be described in words as consisting of a slightly flared body with a fluted neck, designed for easier gripping. *See* 328 F.2d at 926 and 372 F.2d at 540.

lar Park and Fly, Inc., 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985) (citing S.Rep. No. 1333, 79th Cong., 2d Sess., 3–5 (1946) (citations omitted)), quoted with approval in Two Pesos, Inc. v. Taco Cabana, Inc., —— U.S. ——, ——, 112 S.Ct. 2753, 2759–61, 120 L.Ed.2d 615 (1992).

There are four different categories or levels of marks which may be subject to trademark protection. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. The lines of demarcation, however, are not always bright." Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir.1976). The four categories of marks are distinguished in an attempt to prevent consumer confusion concerning the source of goods, and to encourage businesses to invest in producing and marketing goods of high quality, by protecting the good will generated by doing so to engender customer loyalty. Trademark protection is granted to arbitrary, fanciful, and suggestive marks without further inquiry; but not to descriptive marks, unless they have been shown to have acquired secondary meaning. "The provisions of the Lanham Act concerning registration and incontestability distinguish a mark that is 'the common descriptive name of an article or substance' from a mark that is 'merely descriptive.' 15 U.S.C. §§ 1052(e), 1064(c). Marks that constitute a common descriptive name are referred to as generic.... Generic marks are not registrable, and a registered mark may be cancelled at any time on the grounds that it has become generic.... [A] merely descriptive mark cannot be registered unless the Commissioner finds that it has secondary meaning." Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 193–94, 200, 105 S.Ct. 658, 661, 664, 83 L.Ed.2d 582 (1985) (citations omitted).

### PROTECTION OF DISTINCTIVE PRODUCT DESIGNS

"The protection of distinctive product configurations under United States trademark law creates a potential conflict with the policy of the United States patent laws, which allow protection for functional advances in product design only under limited circumstances and only for a limited period of time. In contrast, the protections of the trademark law endure as long as the trademark continues to be used. Thus, a party might attempt to obtain 'perpetual patent' protection for advances in product design by claiming trademark rights in the designs and thereby defeat the central purpose of the patent laws—to reward the inventor of a functional advance in product design with only a limited monopoly and thereafter to allow competitors free access to that advance. ¶ The doctrine of functionality in trademark law evolved out of the conflict between the need to protect the public from confusion as to the source of a product with a particular trade dress and the policy to encourage fair competition in the marketplace through the free use of unpatented product features that enhance a product's performance. Traditionally, under both state unfair competition law and the Lanham Act, the courts have not allowed parties to claim exclusive rights in product features ... which are functional." Stephen F. Mohr, et al., Functionality of Trade Dress: A Review and Analysis of the Case Law 1–2 (U.S. Trademark Ass'n Practice Paper No. 2, 1991) (emphasis added).

### THE FUNCTIONALITY DEFENSE

Our Court of Appeals has held: "[b]asic Lanham Act principles dictate that an owner may not use a trademark to circumscribe the flow of useful ideas and designs in the marketplace. See Note, The Problem of Functional Features: Trade Dress Infringement Under Section 43(a) of the Lanham Act, 82 Colum.L.Rev. 77, 79 (1982)." Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 171 (2d Cir.1991) (emphasis added).

"The 'trade dress' of a product 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics.' LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 75 (2d Cir.1985) (citation omitted). In examining trade dress the focus is on the entire look of the product or packaging. Individual aspects of a trade dress may be eligible for

trademark protection in their own right, but in an action for trade dress infringement each aspect should be viewed in relation to the entire trade dress." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir.1992) (emphasis in original).

Our Court of Appeals has held that: "[c]ourts must proceed with caution in assessing claims to unregistered trademark protection in the design of products so as not to undermine the objectives of the patent laws.... Since trademark protection extends for an unlimited period, expansive trade dress protection for the design of products would prevent some functional products from enriching the public domain. ¶ *This threat is particularly great when ... a first manufacturer seeks broad trade dress protection for a product on the ground that its arrangement of predominantly functional features is distinctive."* Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977–78 (2d Cir.1987) (emphasis added).

In considering the protection afforded by the Lanham Act to unregistered trade dress, the United States Supreme Court recently noted that there is no "textual basis in § 43(a) for treating inherently distinctive verbal or symbolic trademarks differently from inherently distinctive trade dress." *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992). Our Court of Appeals considered the question of functionality in *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71 (2d Cir.1985), in which it held that functionality is a defense, and thus, the burden of proof is on the defendant. *LeSportsac Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir.1985) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 863, 102 S.Ct. 2182, 2193, 72 L.Ed.2d 606 (1982) (White, J., concurring)). While the trademark registration in this case is *prima facie* evidence of the plaintiff's exclusive right to use the silhouette of its plastic wall anchor design as a mark in commerce, the defendants may "challenge exclusivity by way of petition for cancellation under ... 15 U.S.C. § 1064 ... 'as a counterclaim in an infringement suit.' ... [wherein] the defendant has the burden of rebutting

the presumption of plaintiff's right to exclusive use of a registered mark by a preponderance of the evidence." *20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 89 n. 8 (2d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985) (citation omitted).

■ In assessing whether or not a trademark is functional, this Court must consider whether the feature, in this case the silhouette or configuration of the entire product, has inherent utility. To be "functional," the United States Supreme Court has held that the feature must be one that "is essential to the use or purpose of the article or [that] affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982); *see also An Analysis of the Ives Case: A TMR Panel*, 72 Trademark Rep. 118, 126–28 (1982) (comments of J.T. McCarthy). Our Court of Appeals has held that "[a] design feature of a particular article is 'essential' only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough." *LeSportsac Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir.1985) (quoting *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 331 (2d Cir.1983)).

■ The proper inquiry is whether the feature(s) of the product claimed to be distinctive are dictated by function. *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1148 (2d Cir.1987). Our Court of Appeals has held that: "the fact that a design feature performs a function does not make it essential to the performance of that function; it is instead the absence of alternative constructions performing the same function that renders the feature functional." *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1148 (2d Cir.1987). Our Court of Appeals has held that: "by breaking [plaintiff]'s trade dress into its individual elements and then attacking certain of those elements as functional, [defendant] misconceives the scope of the appropriate inquiry.... [Plaintiff] claims as its mark the particular combination and arrangement of design elements that identify its [products] and distinguish them from other [similar

products]. *See Dallas Cowboy Cheerleaders [v. Pussycat Cinema]*, 604 F.2d [200,] 203 [ (2d Cir.1978) ]." *LeSportsac Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir.1985).

Our Court of Appeals has held that: "[t]o avoid undermining the purpose of the patent laws to place useful innovations in the public domain after expiration of a limited monopoly, courts must be sensitive to whether a grant of trade dress protection would close all avenues to a market that is otherwise open in the absence of a valid [and unexpired] patent. *In re Deister Concentrator Co., Inc.*, 289 F.2d 496, 504 (Cust. & Pat.App. 1961) (noting that the reason for refusing to protect functional elements against copying is not that they 'cannot or do not indicate source to the purchasing public but that there is an overriding public policy of preventing their monopolization, of preserving the public right to copy').... ¶ By focusing upon hindrances to legitimate competition, the functionality test, carefully applied, can accommodate consumers' somewhat conflicting interests in being assured enough product differentiation to avoid confusion as to source and in being afforded the benefits of competition among producers. Moreover, this test encourages those seeking trade dress protection for their products to select distinctive non-functional identifying marks." *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 978–79 (2d Cir.1987) (citations omitted).

As our Court of Appeals held in *LeSportsac Inc. v. K Mart Corp.*, 754 F.2d 71 (2d Cir.1985), the policy rationale for the functionality defense is to encourage "competition by preventing advances in functional design from being monopolized." *Id.* at 77; *accord Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2759–61, 120 L.Ed.2d 615 (1992). In a more recent case, the appellate court held that: "the functionality inquiry ... should [focus] on whether bestowing trade dress protection upon [a particular] arrangement of features 'will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.' " *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 79 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111

S.Ct. 1622, 113 L.Ed.2d 720 (1991). The overriding purpose of the functionality defense is "to protect advances in functional design from being monopolized. It is designed to encourage competition and the broadest dissemination of useful design features." *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 331 (2d Cir.1983) (footnote omitted). "[A] critical aspect in considering hindrance to competition is whether bestowing trade dress protection on a product design prevents potential competitors from entering a market that is not foreclosed by a valid patent." *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977 (2d Cir.1987). The *Stormy Clime* court directed that: "the District Court should assess the degree of functionality of the similar features, the degree of similarity between the non-functional (ornamental) features of the competing products, and the feasibility of alternative arrangements of functional features that would not impair the utility of the product. These factors should be considered along a continuum. *See* R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 19.33 at 132 (L. Altman 4th ed. 1983) ('Functionality is often a matter of degree, rather than a binary yes-or-no matter.'). On one end, unique arrangements of purely functional features constitute a functional design. On the other end, distinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional and hence eligible for trade dress protection. In between, the case for protection weakens the more clearly the arrangement of allegedly distinctive features serves the purpose of the product ... especially where the competitor copying such features has taken some significant steps to differentiate its product." *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977 (2d Cir.1987) (citations omitted). The concern of our Court of Appeals in *Stormy Clime* "appears to be that where an allegedly unique trade dress is composed of certain elements, all of which are designed to improve the function of the product in question, the overall design of the product is also functional." Stephen F. Mohr, *et al., Functionality of*

*Trade Dress: A Review and Analysis of the Case Law* 21 (U.S. Trademark Ass'n Practice Paper No. 2, 1991).

This Court has considered the three examples of registered trademarks covering the silhouette of a product with a useful function submitted by the plaintiff. *See* Plaintiff's Memorandum in Opposition to Defendant Titan's Motion for Partial Summary Judgment, filed November 4, 1992 (document no. 30), at pp. 14–15. Based upon that review, there can be no doubt that a "configuration of the goods" *may* be eligible for trademark protection, so long as it is not anticompetitive, *e.g.*, because it is *functional*, and therefore, not distinctive.

## THE VALIDITY OF PLAINTIFF'S TRADEMARK IN THE SILHOUETTE OF ITS PLASTIC WALL ANCHOR

■ In anticipation of a different trademark infringement litigation, now settled, that the plaintiff had brought against different defendants in the Eastern District of New York, the plaintiff commissioned the design of what has been submitted in this litigation as plaintiff's confidential Exhibit H. To do so, they hired Mr. McSherry, now the principal of defendant Titan, who was then working for Mechanical Plastics as its "exclusive consultant." Mr. McSherry designed a potential competitor to the plaintiff's plastic wall anchor that follows the teachings of the now-expired patent, but does not infringe the asserted trademarks. *See* November 3, 1992 Declaration of Nathaniel Garfield (document no. 32), ¶¶ 12–21, at pp. 5–7. The plaintiff asserts that Exhibit H "represents in a single Exhibit, evidence sufficient to defeat the [defendants'] motion." Plaintiff's Memorandum in Opposition to Defendant Titan's Motion for Partial Summary Judgment, filed November 4, 1992 (document no. 30), at p. 19. The Court does not agree.

The two-dimensional drawing in Exhibit H is not manufactured or marketed by any company. The design, while putatively non-infringing, is not one upon which either the plaintiff or the defendant would spend money and risk reputation. It is an inferior design. The United States Supreme Court has held that a feature that is functional, one that "is essential to the use or purpose of the article or [that] affects the cost or quality of the article," *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982), is not capable of being a trademark, and therefore, is ineligible for protection. The features that the Toggler wall anchor has that Exhibit H does not have are functional features. To prevent Titan from utilizing them would be an improper restraint of trade. In attempting to protect by way of trademark the very same advances that were protected for seventeen years by patent, Mechanical Plastics has attempted impermissibly to extend the patent grant.

The plaintiff disputes defendant Titan's assertion that "there are no shapes of plastic wall anchors available to competitors of Mechanical [Plastics] which would not incorporate the essential functional shape of the Toggler." Defendant's Memorandum of Law in Support of Defendant Titan's Motion for Partial Summary Judgment, filed September 30, 1992 (document no. 21), at p. 5. In Exhibits L and M, the plaintiff has provided the Court with examples of commercially available plastic wall anchors from other, unrelated trade sources, which do not include each and every design element of the plaintiff's product, and thus, they assert, do not infringe the plaintiff's asserted trademarks. *See* November 2, 1992 Declaration of Israel Nissenbaum (document no. 32), p. 5 n. 2, and p. 7 n. 3.

Exhibit M is a marked-up copy of Exhibit L. The alternative "ornamental, non-functional and non-patented aspects of anchors which can be adapted by any competitor to create a functioning and competitive anchor, which would not infringe the trademarks in suit," as identified by the plaintiff, include: unbeveled ends, either hinged or cantilevered; larger anti-rotational fins; a plastic nut or bulbous screw engagement on the leading aspect; a unitary arm structure; and a central diamond hollow space. Mechanical Plastics' Toggler plastic wall anchor essentially was designed by Mr. McSherry. McSherry Affidavit, filed September 30, 1992 (documents no. 20 and 23), ¶ 3, at p. 2. In

his sworn affidavit, Mr. McSherry declared that he made alterations to the design of the anchor protected by the '734 patent, primarily because, "its functioning had to be improved for strength and dependability." McSherry Affidavit, filed September 30, 1992 (documents no. 20 and 23), at p. 7. In his sworn affidavit, Mr. McSherry declared that he "extended the connections to the outer ends of the toggle members.... [which] made it easy for the user to fold the members ... [and] brought the connectors into positions to position the inner pivoted ends of the toggle members over center further away from the head where any tension on the connectors would actually strengthen the toggle members against axial movement toward the head." *Id.* at p. 8. Mr. McSherry also "designed roundness into the anchor and [finding] that the folded anchor rotated in the drilled hole.... [he] redesigned the flexible connectors to make them flat along the surfaces that contacted the surface which defined the hole ... [in] the sheet rock. This gave corners to the connectors to dig into the wall material rather than slide over it with a rounded surface.... [and] then added the anti-rotational fins." *Id.* Mr. McSherry also "placed two of the fins parallel to the toggle members and two perpendicular to them, all four extending radially, *basically to better accommodate the molding processes, but also to provide the best positive resistance against rotation* .... These fins dig into the wall material when the anchor is inserted in the wall. Less than four or having the fin extending at other than radial angles *would lessen efficiency.*" *Id.* at p. 9 (emphasis added).

Mr. McSherry further attested that he "designed the ends [ ... to 'come to a rounded tip' ...] so that when the anchor is folded, the tips will easily be inserted in the hole in the wall. In other words, there is a self-centering effect when the edges are inserted with the rounded tips guiding the folded members straight into the hole.... Importantly, *it would not be acceptable to the trades or end users if the self-centering curvatures were not provided.*" *Id.* (emphasis added). Mr. McSherry also attested to his design of the "small round hole in the center of the pivot to receive the tip of a screw

fastener" and, "at the bottom or flanged end, ... a hole of a much larger diameter.... so that the screw tip would still have material to eat into while I kept the hinge wide enough to maintain its integrity as a hinge. *One cannot make a plastic toggle-type anchor without the hinge area as so designed without increasing the chances of failure of the toggle because of reaction to pull.*" *Id.* at pp. 9–10 (emphasis added). Mr. McSherry points out several other minor functional enhancements built into the design of the anchor, and he concludes that "all of the design features that make up the overall 'look' of the registered anchor are essential to the correct and best functioning of a plastic wall anchor of the toggle type." *Id.* at 12. This Court agrees with that analysis.

In Exhibits N, O and P, the plaintiff attempts to demonstrate to the Court, by way of examples it has created, how the plaintiff's wall anchors could be modified physically so as to function as needed, but yet look different enough so as not to infringe the plaintiff's trademarks. *See* November 3, 1992 Declaration of Nathaniel Garfield (document no. 32), ¶¶ 28–32, at pp. 9–11; *see also* Plaintiff's Memorandum in Opposition to Defendant Titan's Motion for Partial Summary Judgment, filed November 4, 1992 (document no. 30), at pp. 20–21.

What the plaintiff has done, essentially, is to take a knife to samples of its Toggler anchor, and they have been mutilated to represent possible alternative designs that utilize *some* but *not all* of the plaintiff's design features. For the moment, the Court will set aside the valid argument that if any one of these designs is acceptable to the plaintiff, then Mechanical must admit that they *all* must be acceptable, and once a competitor may utilize any of all of the proposed modifications, then to use all of them in the same product *cannot* be an infringement pursuant to the case law of our Court of Appeals. *See, e.g., LeSportsac Inc. v. K Mart Corp.,* 754 F.2d 71 (2d Cir.1985).

Nonetheless, the Court has examined each of the alternative anchor designs proposed by the plaintiff in Exhibits N, O, and P. In each of the four anchors on the top row of Exhibit

N, the arcuate "elbow" ends have been chopped off at an angle perpendicular to the arms. The result is an anchor that, when folded for insertion, has two blunt squared off stubs that seem likely to catch on the hole. While the two anchors on the lower row of Exhibit N do not have that same problem, without their perpendicular anti-rotational fins, these two anchors seem likely to rotate within the hole, contrary to the purpose stated by Mr. McSherry for the anti-rotational fins to be at perpendicular angles to one another.

The four examples in Exhibit O also seem inferior to the commercial product. The first anchor broke across the midline on the first attempt to fold it into the insertion position. The second anchor is imbedded in a test board, and is thus difficult to evaluate, although it does not rotate freely. The third anchor is quite brittle, has blunt ends, and its lack of perpendicular anti-rotational fins will likely not prevent it from rotating freely in the hole. Finally, the fourth anchor was broken across the midline even before an attempt was made to fold it. These are not commercially reasonable substitutes.

The seven competing products in Exhibit P, like their two-dimensional representations in Exhibits L and M, are similar, but do not share each of the design enhancements which Mr. McSherry has attested are beneficial to a better functioning plastic wall anchor. They are not, therefore, commercially reasonable substitutes.

■ The Trademark Examining Attorney raised the question of functionality during the plaintiff's prosecution of Trademark B, the '979 trademark. Initially, he rejected the plaintiff's application to register the silhouette of the plaintiff's plastic wall anchor. *See* November 3, 1992 Declaration of Nathaniel Garfield (document no. 32), ¶ 33, at p. 11; *see also* Plaintiff's Memorandum in Opposition to Defendant Titan's Motion for Partial Summary Judgment, filed November 4, 1992 (document no. 30), at pp. 19–20. Probably by mere force of argument the plaintiff succeeded in overcoming the examiner's rejection. *Id.* This Court shows deference to the *factual* findings of the United States Patent and Trademark Office examiners. *Goya Foods,*

*Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 852–53 (2d Cir.1988) (citing cases). Nonetheless, when a United States District Court is called upon to make a registration or cancellation decision, "[t]he civil action before the District Court is intended to be a trial *de novo.*" *Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 853 (2d Cir.1988) (citing *Wilson Jones Co. v. Gilbert & Bennett Mfg. Co.,* 332 F.2d 216, 218 (2d Cir.1964)).

Plaintiff has submitted, as Exhibit K, the prosecution history of Trademark B, the '979 trademark. *See* November 2, 1992 Declaration of Israel Nissenbaum (document no. 32), ¶¶ 22 and 24, at pp. 5–6. Initially, the Trademark Examining Attorney refused to register the mark, "because the matter presented for registration constitutes a configuration of the goods and, as such, is merely descriptive of the goods. In the absence of evidence that it has a secondary meaning or has become distinctive, as applied to the goods, it may not be registered on the Principal Register." Exhibit K.

■ A product has attained secondary meaning when the lay public mentally associates the look of a particular product with one single producer, or source, even if members of the public are unable to name precisely the source. *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982); *see also LeSportsac Inc. v. K Mart Corp.,* 754 F.2d 71, 78 (2d Cir.1985). Before the United States Patent and Trademark Office Examining Attorney, the plaintiff produced affidavits from customers of the plaintiff, each affiant attesting in a highly conclusory manner to an opinion that the design of the plaintiff's plastic wall anchors is distinctive. *See* Exhibit K. The "affidavits" each consisted of a two-page word-processed document that had a caption and seven paragraphs which went through each statutorily required step to "establish" secondary meaning. The "affiant" needed to enter only his or her name, title, and employer in the spaces provided in the first paragraph, and then at the bottom of the form, to enter the date in the space provided, and to have his/her signature notarized. *See* Exhibit K. The Court finds it somewhat surprising that an experienced Examining Attorney

could accept such biased contrivances as "evidence" of anything. However, he did so. The Examining Attorney's refusal to register was withdrawn upon his revised finding that the side-view silhouette of plaintiff's plastic wall anchor had acquired secondary meaning as a distinctive design for a particular product, known to the purchasing public as emanating from a particular source. On August 18, 1987, the examiner withdrew his original rejection, and allowed the trademark to be published in the Official Gazette for the purpose of allowing others to file an opposition to the registration, pursuant to 15 U.S.C. §§ 1062, 1063. *See* Notice of Publication Under 12(a) at the back of Exhibit K.

The Court of Customs and Patent Appeals had similar doubts concerning the consumer affidavits in reconsidering the refusal of a trademark registration in *Application of Mogen David Wine Corp.*, 372 F.2d 539 (C.C.P.A.1967). There the court wrote: "the affidavits submitted by appellant leave much to be desired in the way of substantial proof that the container itself had run the gamut of acquiring a secondary meaning. The approximately fifty affiants, customers of appellant, located generally throughout the United States, executed affidavits similar in language and purport which had been prepared and submitted by appellant. In substance, they amounted to hardly more than a carte blanche approval of that which had been formulated by a party naturally and understandably desirous of serving its own interest." *Id.* at 541.

At that time, Mr. McSherry did not file either an opposition to the registration, nor an application to cancel the registration. He was then solely employed as the exclusive technical consultant to Mechanical Plastics. Thus, it was most likely in the best interests of Mr. McSherry to support the registration of the mark at that time. It was only *after* he was fired by the plaintiff, and he founded Titan, a new business entity created to compete with Mechanical Plastics in the field of plastic wall anchors, that Mr. McSherry sought to have the registration of the '979 trademark cancelled by this Court. Nevertheless, "neither opposition to registration nor a petition for cancellation under 15 U.S.C., section 1064, is a prerequisite to a cancellation counterclaim in an infringement action." *Marshak v. Green*, 505 F.Supp. 1054, 1060 (S.D.N.Y.1981).

## CANCELLATION OF PLAINTIFF'S TRADEMARK

This lawsuit was commenced within the required five year statutory period before Trademark B, the '979 trademark, reached incontestable status, pursuant to 15 U.S.C. § 1065(1), (2). "Within five years of registration, any person who believes that he is or will be damaged by registration may seek to cancel a mark." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 202, 105 S.Ct. 658, 666, 83 L.Ed.2d 582 (1985). *See generally Dunfey Hotels Corp. v. Meridien Hotels Invs. Group, Inc.*, 504 F.Supp. 371, 381–82 (S.D.N.Y.1980). The trademark, therefore, may be cancelled for any reason that would have been sufficient to deny registration in the first instance. 15 U.S.C. §§ 1064, 1071(b)(1). Once a certificate of registration has been issued, it "shall be prima facie evidence of the validity of the registered mark and ... of the registrant's exclusive right to use the registered mark ... but shall not preclude another person from proving any legal or equitable defense or defect ... which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a). Defendant Titan now comes before this Court seeking a declaratory judgment cancelling the '979 trademark on the ground that it is functional, and hence, was improvidently granted a certificate of registration.

The Court has viewed the product samples submitted by the plaintiff as "evidence" that there are alternate designs available to one wishing to compete in the field of plastic wall anchors. The '979 trademark, however, is for the "configuration of the goods" that is, a two-dimensional representation of the side view silhouette of the product in its still state (as opposed to Trademark A, which is a side-view representation of the product being flexed throughout its range of motion). As such, the registered mark is merely functional, and therefore, ineligible for trademark protection. While there may well be alterna-

tive ways of making wall anchors, here the only issue is whether the asserted trademark is valid. Because the mark is functional, and its silhouette presents a better, if not the best design for ease in installation and improved function, plaintiff's plastic wall anchor is *not* the proper subject for a valid registered trademark.

## CONCLUSION

For the reasons given above, the Court concludes that partial summary judgment in favor of the defendants is appropriate on the issue of the functionality of plaintiff's Trademark B. The defendants' motion for partial summary judgment is granted.

There are other claims remaining in the lawsuit, but the Court recognizes that the alleged infringement of Trademark B is probably at the heart of this litigation. The cancellation of plaintiff's federally registered trademark, U.S. Reg. No. 1,510,979, will likely cause the plaintiff great hardship, or work an injustice, if our Court of Appeals were to reverse on the issue of functionality. There is no just reason for delay, and in the interest of sound judicial administration and efficiency, the Court concludes that a separate final declaratory judgment should be entered on the issue of functionality, pursuant to F.R.Civ.P. 54(b). *See Hogan v. Consolidated Rail Corp.*, 961 F.2d 1021, 1025–26 (2d Cir. 1992).

The defendants are directed to settle a judgment on notice, ordering the Commissioner of Patents and Trademarks to cancel U.S. Registration No. 1,510,979, issued on November 1, 1988 to Mechanical Plastics Corporation. The enforcement of such judgment, and all further proceedings in this litigation in the District Court, shall be stayed, pursuant to F.R.Civ.P. 62(h), for a period of thirty days within which the plaintiff may take an interlocutory appeal to the Second Circuit, if so advised. In the event that a timely interlocutory appeal is taken from this order, and prosecuted in good faith, the stay shall remain in effect, unless dissolved by this Court upon good cause shown,

until the filing in this Court of the Mandate of the Court of Appeals.

**SO ORDERED.**